**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Incline Plaza Development, *a New York Limited Liability Company*, | No. 25-cv-2767 (KMM/LIB) |
| Plaintiff and Counterclaim Defendant, | **ORDER** |
| v. | |
| Stearns Financial Services, Inc. d/b/a Stearns Bank National Association, *a Minnesota Corporation*, | |
| Defendant, Counterclaim Plaintiff, and Counterclaim Defendant, | |
| v. | |
| Lazar Ostreicher and Eli Leshkowitz, | |
| Counterclaim Defendants and Counterclaim Plaintiffs. | |

This matter is before the Court on Defendants Stearns Financial Services, Inc.'s[1] Motion for Judgment on the Pleadings. (Dkt. 25.) For the following reasons, the Motion is granted in part and denied in part.

## I.      BACKGROUND

### A.      Incline's Complaint

This case concerns a failed property development project in Duluth, Minnesota. The story begins with Plaintiff Incline Plaza Development LLC ("Incline"), a New York-based property development company run by Lazar Ostreicher and Eli Leshkowitz.[2] In 2024, the City of Duluth and the Duluth Economic Development Authority (together, "Duluth") granted Incline approval to develop a piece of property into a $500 million mixed-use housing development dubbed "The Incline" ("the Project"). (Dkt. 1 ¶¶ 5–6.) Along with the approval, Duluth gave Incline certain tax benefits to assist in the Project's development. (*Id.* ¶ 7.)

To finance the Project, Incline entered into an agreement with SGGI Holdings, Ltd. ("SGGI"). (*Id.* ¶ 8.) That agreement provided that SGGI would lend Incline $45 million

---

[1] Incline names "Stearns Financial Services, Inc. d/b/a Stearns Bank National Association" as Defendant to this action, which Stearns contends is the incorrect party in interest. However, for simplicity, the Court refers to Defendant as "Stearns" unless otherwise noted. *See* Section III.A (addressing Stearns's argument).

[2] In its Answer and Counterclaim, Stearns names Ostreicher and Leshkowitz personally as "Counterclaim Defendants" (Dkt. 9); however, they are more appropriately referred to as Third-Party Defendants because they were not parties to the original Complaint. In any event, Ostreicher and Leshkowitz assert their own claims against Stearns (Dkt. 18), and the Court refers to Ostreicher and Leshkowitz together as "Counterclaimants." The Court also refers to Incline, Ostreicher, and Leshkowitz, collectively, as "Plaintiffs."

for use in developing Phase 1 of the Project—a 70-unit condominium building—as long as Incline procured a standby letter of credit[3] ("SbLC") for SGGI. (*Id.* ¶¶ 8–9.) Specifically, Incline had to obtain an SbLC for $27 million from another lending institution to be provided to SGGI via a SWIFT MT760 message.[4] (*Id.* ¶ 9.) SGGI would not release the $45 million in funding for the condo building until it received the required SbLC.

Incline approached Stearns Bank, a Minnesota entity, about obtaining an SbLC. (*Id.* ¶ 10.) The parties dispute whether Incline and Stearns came to a final agreement on the issuance of an SbLC. According to Incline's Complaint, after conducting the due diligence and underwriting on Incline's request, Stearns agreed to issue an SbLC to SGGI via a SWIFT MT760 message in the amount of $27 million. (*Id.* ¶ 11.) To support its conclusion that a formal agreement had been reached, Incline cites four documents provided by Stearns: (1) a letter sent from Stearns to SGGI on September 17, 2024 with the subject line,

---

[3] A standby letter of credit is a "letter of credit . . . intended to provide payment to the seller only if the buyer of the invoiced goods failed to make payment[.]" *Fed. Deposit Ins. Corp. v. Phila. Gear Corp.*, 476 U.S. 426, 428 (1986). In other words, an SbLC is provided by a third party to the seller as a guarantee that some amount of money will be returned to the seller whether or not the buyer sufficiently performs on its contract. In this case, an SbLC would provide SGGI a level of guarantee that it would recoup some amount of its loan if Incline was unable to pay.

[4] The Society for Worldwide Interbank Financial Telecommunication, or SWIFT, "provides electronic instructions on how to transfer money among 7,800 financial institutions worldwide." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 143 (2d Cir. 2011) (cleaned up); *see generally* Rebecca Nelson & Liana Wong, International Financial Messaging Systems, Cong. Rsch. Serv. (July 19, 2021) (describing the role of SWIFT), https://www.congress.gov/crs-product/R46843 (last visited July 15, 2026). An MT760 "is a financial message used specifically for issuing or confirming a Standby Letter of Credit and serves as a legally binding and irrevocable communication from the issuing bank, guaranteeing payment to the beneficiary." (Dkt. 1 ¶ 20.)

"Commitment to Issue a Standby Letter of Credit" (Dkt. 1 ¶¶ 12–14; Dkt. 1-3 (letter)); (2) a document on Stearns Bank letterhead entitled, "Irrevocable Standby Letter of Credit," provided to Incline on October 16, 2024 (Dkt. 1 ¶ 16; Dkt. 1-4 (document)); (3) a document entitled, "Standby Letter of Credit Construction and Business Loan Agreement" (Dkt. 1 ¶ 21; Dkt. 1-5 (document)); and (4) a document entitled, "Promissory Note" (Dkt. 1 ¶ 21; Dkt. 1-6 (document)). The existence and dissemination of these documents, Incline alleges, illustrates that the parties had a final agreement regarding the issuance of an SbLC.

However, not long after their agreement was allegedly finalized, Incline states that Stearns began to raise concerns about its inability to connect to the SWIFT system and, as a result, its inability to transmit the SbLC to SGGI and SGGI's advising bank, Bank of America. (*Id.* ¶ 24.) On November 12, 2024, Incline received a letter from Stearns stating that the bank was disconnected from the SWIFT system and provided Incline two options of how to proceed: (1) allow Stearns to transmit the SbLC to SGGI through another bank, JP Morgan, or (2) wait "approximately 90 days" for Stearns to reactivate their SWIFT connection. (*Id.* ¶¶ 25–27 (emphasis omitted); Dkt. 1-7 (letter).) "In either event, Stearns Bank assured Incline that the SbLC was confirmed, the $27,000,000 Million in funds guaranteed, and that the MT 760 would be accomplished, one way or another, in short order." (Dkt. 1 ¶ 28.) That same day, Stearns sent a letter to Bank of America informing them of the issue and proposing that the SbLC be issued via bonded courier, a proposal Bank of America rejected. (*Id.* ¶¶ 30, 32; Dkt. 1-8 (letter).) Despite these issues, Incline alleges that Stearns once again "confirmed it would make the [SWIFT] transmission." (Dkt. 1 ¶ 33.) As Incline recounts the process, "[o]ver and over and over again, both in

4

writing and on the telephone, Stearns Bank assured Incline that the SbLC funds were guaranteed and that Stearns Bank would deliver the SbLC via MT 760 as required by SGGI and Bank of America." (*Id.* ¶ 34.)

Following these communications, and "[i]n complete reliance on the Stearns Bank Commitment Letter and both the written and verbal assurances" it received from Stearns, Incline formalized its relationships with SGGI and Duluth, "surveyed the real property, purchased a Title Insurance Policy . . . and prepared to close the loan." (*Id.* ¶ 38.) Bereft of funds but nonetheless believing that Stearns would transmit the SbLC shortly, Incline alleges that it started to advance funds to begin construction in accordance with Duluth's timeline, breaking ground on Phase 1 of the Project on December 10, 2024. (*Id.* ¶¶ 39–40.) Representatives of Stearns attended the groundbreaking. (*Id.* ¶ 41.)

By February 2025, "nearly three months [after the alleged agreement] and passed [sic] the 90-day reconnection period," Stearns had still not transmitted the SbLC to SGGI. (*Id.* ¶ 43.) Incline states that it then "reached out to Stearns Bank to demand transmission of the SbLC." (*Id.* ¶ 45.) Incline alleges that Stearns responded with a letter and "revised SbLC" which Incline construed as further guarantee of the SbLC's forthcoming transmission. (*Id.* ¶¶ 46–47; Dkt. 1-11 (letter and revised SbLC).) As such, Incline "advanced even more funds and continued construction on the development project." (Dkt. 1 ¶ 48.)

However, never having received an SbLC, SGGI terminated its partnership with Incline on May 8, 2025. (*Id.* ¶ 51.) Incline alleges that at the time Stearns nonetheless continued to suggest the SbLC transmission was imminent. (*Id.* ¶ 52.) Duluth subsequently

provided Incline a Notice of Breach on June 2, 2026, citing, in part, Incline's lack of financing. (*Id.* ¶ 53; Dkt. 1-13 (Notice of Breach).) At the time of its filing on July 3, 2025, the Complaint appears to have anticipated the entirety of the Project collapsing. At no point was the SbLC transmitted from Stearns to SGGI.

The Complaint asserts seven state law claims against Stearns: (1) "First Material Breach of Loan"; (2) "Fraud and/or Intentional Misrepresentation"; (3) "Deceptive Conduct"; (4) "Inducement"; (5) violations of Minn. Stat. § 513.33; (6) violations of the Minnesota Unfair Trade Practices Act § 325D.44; and (7) violations of the Minnesota Consumer Fraud Act § 325F.69. (Dkt. 1 ¶¶ 65–123.) Incline accompanies its Complaint with 12 exhibits.

**B.   Stearns's Answer and Counterclaims**

Stearns tells a starkly different story in response. Stearns alleges not only that it never reached an agreement with Incline regarding issuance of an SbLC, but also that Incline released its claims against Stearns in a separate transaction. Starting with the former, Stearns asserts that while the parties negotiated over the terms of an SbLC, no agreement was ultimately reached. Stearns rejects many of the Complaint's characterizations about the negotiations, especially those relating to the documents Incline attaches as exhibits with its Complaint. For example, what Incline refers to as a finalized SbLC (*see* Dkt. 1 ¶ 21; Dkt. 1-5), Stearns contends is "an unexecuted draft" SbLC (Dkt. 9 ¶ 21). Stearns also denies making any guarantees to Incline about providing an SbLC. (*E.g.*, *id.* ¶¶ 46, 48.) To this end, Stearns includes a letter entitled "Commercial Loan Proposal"

6

that states that there was "not a commitment to lend" as well as a sheet of "General Terms"

signed by Ostreicher, both dated September 17, 2024. (Dkt. 9-2.)

Regardless, Stearns asserts that Incline has already released the claims it now asserts

in its Complaint. Aside from the SbLC negotiations, Stearns states that it did come to two

separate agreements with Incline. The first was a "Short-Term Loan" dated November 22,

2024, in which Stearns agreed to directly lend Incline $5,600,000, the terms of which stated

that Incline released any claims stemming from the SbLC negotiations. (Dkt. 9 ¶ 11.) These

terms stated, in relevant part:

> Lender's [Stearns] agreement under the Loan Documents to extend the Loan to Borrower, is separate and distinct from Borrower's [Incline] request for Lender to issue a $27,000,000.00 Standby Letter of Credit . . . and nothing in this Loan Agreement or the other Loan Documents or any other agreement or correspondence prior to the date hereof shall be construed as a promise, guaranty or commitment by Lender to issue the SBLOC. . . . In consideration of Lender making the Loan to Borrower and other consideration, the sufficiency of which is hereby acknowledged, Borrower and each Guarantor [Counterclaimants] . . . **hereby knowingly and voluntarily release and forever discharge any and all demands, claims, causes of action, losses, damages, expenses and liabilities of any kind, direct or indirect, known or unknown against Lender** . . . **arising from any delays in or failure of Lender in obtaining the registration or approvals necessary for Lender to issue and deliver the SBLOC through the SWIFT MT 760 Delivery Method**. . . . For purposes of clarity and the avoidance of doubt, such waivers and releases in favor of [Stearns] include without limitation, any and all Claims arising under common law or any civil statutes, claims for breach of contract, fraud, misrepresentation, estoppel, defamation, claims for compensatory damages, tort claims, warranty claims, consequential damages, punitive damages, attorneys' fees and costs.

(*Id.* (emphasis in Answer, but other emphasis removed); Dkt. 9-7 at 5–6.[5]) The second,

dated March 6, 2025 and referred to as the "Modification Agreement," extended the

maturity date of the Short Term Loan and reaffirmed the release of claims made in the

earlier agreement:

> Borrower and Guarantors acknowledge the validity of the [Short Term] Loan Documents, as modified in this Modification Agreement or in any document delivered pursuant to this Modification Agreement, which are the legal, valid and binding obligations of the makers thereof in favor of Lender and enforceable against Borrower [Incline] and Guarantors [Counterclaimants] in accordance with their terms, all of which are hereby reaffirmed by Borrower and Guarantors in their entirety and incorporated into this Modification Agreement by reference. Borrower and Guarantors acknowledge that no Borrower or Guarantor has any claims, defenses, setoffs or counterclaims against Lender with respect to the Loan Documents, as modified in this Modification Agreement or in any document delivered pursuant to this Modification Agreement.

(Dkt. 9 ¶ 11 (emphasis removed); Dkt. 9-8 at 3.) Together, Stearns asserts that these

documents show Incline had released its claims against the bank. Stearns also includes 13

affirmative defenses to Incline's claims, including waiver and release. (Dkt. 9 ¶¶ 124–36.)

Stearns asserts six counterclaims against Incline, Counterclaimants Ostreicher and

Leshkowitz, and various Does, including (1) Default on the Note; (2) Foreclosure of

Mortgage; (3) Replevin; (4) Enforcement of Ostreicher Guaranty; (5) Enforcement of

---

[5] Citations are to ECF pagination.

Leshkowitz Guaranty; and (6) Subordinate Interests.[6] (*Id.* ¶¶ 173–90.) Stearns's Answer and Counterclaims are accompanied by 15 exhibits.

**C.      Plaintiffs' Answer & Ostreicher and Leshkowitz's Counterclaims**

Plaintiffs also sharply contest the opposition's allegations. Notably, Plaintiffs contend that they never entered into the Short Term Loan and Modification Agreements, and instead allege that the signatures on those documents purporting to be theirs were inauthentic and fraudulent. (Dkt. 18 ¶¶ 57–61, 155–65.) Plaintiffs also assert 14 affirmative defenses.[7] (Dkt. 18 at 9–11.)

---

[6] While these counterclaims are not directly at issue in this Motion, they are relevant to determine the validity of Plaintiffs' affirmative defenses.

[7] Plaintiffs' list 16 affirmative defenses, but two are duplicates of previously stated defenses. The defenses are (1) failure to state a claim under Rule 12(b)(6); (2) that Stearns's claims are barred, "in whole or in part, by the doctrines of release, waiver, estoppel, ratification, and/or laches"; (3) that the claims are barred "to the extent that Stearns Bank acted in bad faith or in an otherwise tortious fashion"; (4) that the claims are barred by doctrine of first material breach; (5) that the claims are barred by the doctrine of unclean hands; (6) that Stearns's damages claims "must be dismissed, reduced, or otherwise set-off to the extent Stearns Bank caused or contributed to any of the claimed damages"; (7) Plaintiffs "assert all available rights to set-off and/or off-set, whether by contract or in equity"; (8) that the claims are barred by the applicable statute of limitations; (9) that the claims are barred by Stearns's breach of "related agreements"; (10) that the claims are "barred to the extent that Stearns Bank acted in bad faith or in an otherwise tortious fashion, including, without limitation, through deception"; (11) that the claims are "barred to the extent that Stearns Bank acted in bad faith or in an otherwise tortious fashion, including, without limitation, through fraud"; (12) a repeat of Defense 7: that Plaintiffs "affirmatively assert all available rights to set-off and/or off-set, whether by contract or in equity"; (13) a repeat of Defense 9: that the claims are barred by Stearns's breach of "related agreements"; (14) a placeholder for future affirmative defenses; (15) asserting that the Stearns's counterclaims are improper under Rule 11; and (16) asserting Plaintiffs' own claims against Stearns as an affirmative defense.

Individually, Counterclaimants Ostreicher and Leshkowitz respond with counterclaims against Stearns. In large part, Counterclaimants' allegations mirror those in Incline's Complaint. However, Counterclaimants supplement those with additional allegations related to the non-SbLC agreements asserted by Stearns against Incline, Ostreicher, and Leshkowitz. Specifically, Counterclaimants assert that an "Advance Agreement"—distinct from the Short Term Loan—was provided by Stearns upon "[r]ecognizing that its own failures and that its inability to transmit the SbLC via the SWIFT MT 760 was causing Incline to suffer significant loss," which was an "offer[] to advance Incline $5,600,000.00 Million [a]gainst the $27,000,000.00 SbLC[.]" (*Id.* ¶ 43; *id.* ¶ 44 ("The purpose of the Advance was to provide Incline with capital while Stearns Bank performed under the agreement and transmitted the SbLC via the SWIFT MT 760.").) Through the Advance, the parties "expressly agreed that in the event Stearns Bank did not transmit the MT 760 to SGGI within ninety (90) days of the date the Advance, Incline would not be responsible to pay back the money and would not be in default," and instead, Stearns would take steps to "extend and/or modify the term" of the Advance until the SWIFT transmission was made. (*Id.* ¶ 47.) However, Counterclaimants admit that this "Advance Agreement" was not in writing, instead pointing to an email dated November 22, 2024 from Stearns suggesting that such an agreement was made. (*Id.* ¶¶ 48–50.)

Counterclaimants acknowledge the existence of the Short Term Loan but argue that that contract was never agreed to. (*Id.* ¶¶ 56–58.) Instead, Counterclaimants allege that Stearns used the signature pages from the SbLC agreement and fraudulently and impermissibly affixed them to the Short Term Loan documents. (*Id.* ¶¶ 58–61.) As for the

10

Modification Agreement, Counterclaimants allege that they understood that the document was "drafted only to extend the repayment date [of the Advance] through April 2025 [a]nd that all other terms of the Advance agreement remained the same." (*Id.* ¶ 77.) They admit that they signed the Modification Agreement in their capacities as members of Incline, but that they "never agreed" to personally guarantee the Modification Agreement, stating that their signatures "were neither authorized nor approved." (*Id.* ¶¶ 78–79.)

Ostreicher and Leshkowitz assert the following counterclaims against Stearns: (1) "Fraud and/or Intentional Misrepresentation"; (2) "Deceptive Conduct"; (3) "Inducement"; (4) violations of Minn. Stat. § 513.33; (5) violations of the Minnesota Unfair Trade Practices Act § 325D.44; and (6) violations of the Minnesota Consumer Fraud Act § 325F.69. (*Id.* ¶¶ 103–63.) The Answer and Counterclaims include 11 exhibits.

**D.    Stearns's Answer to Counterclaims**

The final pleading—Stearns's Answer to Ostreicher and Leshkowitz's counterclaims—again raises significant factual disputes. Stearns first disagrees that there was an Advance Agreement separate from the Short Term Loan and points to language within the Short Term Loan specifying that the agreement was indeed a loan and was entirely separate from the SbLC negotiations. (Dkt. 20 ¶ 43.) Stearns also denies Counterclaimants' allegations that Ostreicher and Leshkowitz did not serve as guarantors to the agreements in question, attaching to it Answer signed documents providing as such. (*Id.* ¶ 53; Dkt. 20-5 (Ostreicher guaranty); Dkt. 20-6 (Leshkowitz guaranty).) Stearns also denies that it "forged" or otherwise signed the documents without authorization (*e.g.*, Dkt. 20 ¶ 86) and attaches email communications from William Burns, attorney for Plaintiffs,

11

both agreeing to the terms of the Short Term Loan as well as authorizing Stearns to "slip"[8] Counterclaimants' signatures on their behalf. (Dkt. 20 ¶ 57; Dkt. 20-11 (emails); Dkt. 20-12 (emails).) Stearns also alleges that once the Short Term Loan document was finalized and circulated, Plaintiffs never objected. (Dkt. 20 ¶ 55; Dkt. 20-7 (emails); Dkt. 20-8 (emails).) Stearns provides similar documents and emails for the Modification Agreement. (Dkt. 20 ¶¶ 76, 78–79; Dkt. 20-14 (DocuSign confirmation email); Dkt. 20-15 (emails); Dkt. 20-16 (emails).) Stearns's Answer to Counterclaims is accompanied by 16 exhibits.

* * *

From these pleadings, Stearns filed a Rule 12(c) Motion for Judgment on the Pleadings on October 23, 2025. (Dkt. 25.) Stearns's Motion seeks (1) to dismiss Stearns Financial Services, Inc. as a party; (2) dismiss the Complaint; (3) dismiss Counterclaimants' counterclaims; and (4) "preclud[e] all defenses asserted" by Plaintiffs as barred by Minn. Stat. § 513.33. (*Id.*) The Court held a hearing on the Motion on December 4, 2025. (Dkt. 49 (minute entry).)

## II.   LEGAL STANDARD

A motion for judgment on the pleadings pursuant to Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion

---

[8] "Slipping" is the process of attaching a previous signature to another agreement.

of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the challenged pleading to be true and take all reasonable inferences from those facts in the light most favorable to the nonmoving party. *Ingram v. Ark. Dep't of Corr.*, 91 F.4th 924, 927 (8th Cir. 2024). But the Court need not accept as true any wholly conclusory allegations or legal conclusions drawn from the facts. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

## III.   DISCUSSION

### A.   Misnomer Principle

The Court starts with Stearns's request to dismiss Stearns Financial Services, Inc. ("SFSI") as a party. The Complaint names "Stearns Financial Services, Inc. d/b/a/ Stearns Bank National Association" as the sole Defendant to this action. (Dkt. 1 at 1.) Stearns contends this is error because SFSI and "Stearns Bank National Association" are two distinct entities, and only the latter was involved with the transactions at issue. (Dkt. 27 at 19–20.) Plaintiffs do not dispute these points but maintained at the December 4 hearing that SFSI might ultimately be the correct party in interest. Regardless, Plaintiffs state that they will "immediately comply" with an order requiring them to amend their pleadings. (Dkt. 31 at 17.)

13

The Eighth Circuit has established the "misnomer principle" for cases in which the plaintiff accidentally names the wrong defendant, like when a "plaintiff has sued a corporation but misnamed it." *Roberts v. Michaels*, 219 F.3d 775, 778 (8th Cir. 2000). In such cases, the district court can either dismiss the complaint without prejudice or grant the plaintiff leave to amend the complaint. *Id.* As the parties have already filed several claims and counterclaims—and given the additional activity this case has seen since its filing—the Court finds it most appropriate to grant Plaintiffs leave to file amended pleadings for the sole purpose of substituting "Stearns Bank National Association" as Defendant. To this extent, the Motion is granted, and Plaintiffs must file the amended pleadings permitted by this Order within seven days. Should it be confirmed during the course of discovery that Stearns Financial Services, Inc. is a party in interest, Plaintiffs may seek leave to amend their pleadings to add it as a party. Updated responsive pleadings from Stearns are not necessary at this time.

**B.    Merits**

The bulk of Stearns's Motion concerns whether Plaintiffs have sufficiently plead the existence of an agreement under Minnesota law. Specifically, Stearns argues that Plaintiffs have failed to plead that a "credit agreement" was reached within the requirements of Minn. Stat. § 513.33. Minnesota statute distinguishes credit agreements— or agreements "to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation"—from other types of contracts, and establishes additional requirements for them to be enforceable. Minn. Stat. § 513.33, subd. 1(1). Centrally, § 513.33 requires credit agreements to be in writing,

making any unwritten credit agreement unenforceable: "A debtor[9] may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor[10] and the debtor." *Id.* § 513.33, subd. 2. The Minnesota Supreme Court has interpreted § 513.33 broadly, holding that the statute precluded the quasi-contract claim of promissory estoppel when based on an underlying credit agreement. *Figgins v. Wilcox*, 879 N.W.2d 653, 658–59 (Minn. 2016). Applying § 513.33 to Plaintiffs' pleadings, Stearns argues that Plaintiff has failed to state a claim.

Stearns raises real questions about Plaintiffs' ability to satisfy § 513.33; the Court has concerns, however, about resolving the many issues raised by the parties on a Rule 12(c) motion. Rule 12(c) is fundamentally tool for "disposing of cases in which there is no substantive dispute that warrants the litigants and the court proceeding further" than the pleadings stage. 5C *Wright and Miller's Federal Practice & Procedure* § 1368 (3d ed.) (Apr. 2026 update). This is why a Rule 12(c) motion is treated in material respects like a Rule 12(b)(6) motion. *See Clemons*, 585 F.3d at 1124. It is also why, comparable to a Rule 56 motion for summary judgment, a motion for "[j]udgment on the pleadings should be granted only if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law." *Porous Media Corp. v. Pall Corp.*,

---

[9] A "debtor" is "a person who obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor[.]" Minn. Stat. § 513.33, subd. 1(3).

[10] A "creditor" is "a person who extends credit under a credit agreement with a debtor[.]" Minn. Stat. § 513.33, subd. 1(2).

15

186 F.3d 1077, 1079 (8th Cir. 1999); *Wright & Miller* § 1368 ("A motion for judgment on the pleadings under Rule 12(c) may be granted only if all material issues can be resolved on the pleadings by the district court; otherwise, a summary judgment motion or a full trial is necessary.") (footnote omitted). "[H]asty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." *Wright & Miller* § 1368 (footnote omitted).

The parties' pleadings make clear that this case is not amenable to resolution on the pleadings. Instead, the parties dispute central factual allegations underpinning each claim, counterclaim, and defense asserted, including the nature and/or validity of certain documents; the existence and/or validity of certain oral statements; the timeline in which statements and documents were made and provided to one another; and the authenticity of the signatures on certain documents at issue. The Court declines to resolve these important factual disputes now or to conclude that there is no document cited by Plaintiffs that satisfies Minn. Stat. § 513.33, subd. 2's requirement that a credit agreement be in writing. In short, the factual allegations, as the Court has summarized above, illustrate that this is not the type of case that Rule 12(c) was created to summarily resolve.

The extensive record provided at this stage supports this conclusion. "When considering a motion for judgment on the pleadings . . . , the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, . . . as well as materials that are necessarily embraced by the pleadings." *Porous Media Corp.*, 186 F.3d at 1079 (cleaned up). If exhibits from outside the pleadings are considered, "the motion must be treated as one for

summary judgment under Rule 56." Fed. R. Civ. P. 12(d). It is within the Court's discretion to determine whether to consider extraneous exhibits, and thus whether to convert a Rule 12(c) motion into one for summary judgment. *See Casazza v. Kiser*, 313 F.3d 414, 417–18 (8th Cir. 2002); *Wetzel v. Axis Clinicals LLC*, No. 15-cv-3122 (JNE/SER), 2016 WL 81795, at *1 (D. Minn. Jan. 7, 2016) ("The Court, in its discretion, declines to convert Defendant's Rule 12 motion into a Rule 56 motion.") (citing *Casazza*, 313 F.3d at 418).

These pleadings include over 50 exhibits, including 23 provided by Plaintiffs with their Complaint and Counterclaims, and another 31 exhibits attached to Stearns's responsive pleadings. While the Court frequently considers documents such as contracts when considering a Rule 12(c) motion, each side goes far beyond the typical bounds of a motion for judgment on the pleadings, presenting drafts, emails, letters between parties and non-parties, financial statements, public documents, and representations about the existence of additional documents not yet before the court. Given the scope of the record and the nature of the documentary and other evidence submitted, this is not a situation where the Court can determine that there are no material facts in dispute and that Stearns is entitled to judgment as a matter of law. *See Insignia Sys., Inc. v. News Corp.*, No. 19-cv-1820 (MJD/BRT), 2020 WL 1678052, at *4 (D. Minn. Mar. 17, 2020) ("Defendants ask too much of Rule 12(c) under the circumstances of this case. Therefore, this Court recommends denying Defendants Motion for Judgment on the Pleadings."), *R&R adopted*, 2020 WL 1678263 (D. Minn. Apr. 6, 2020).

Because of the significant number, nature, and materiality of the factual disputes presented, the Court likewise declines to convert this Rule 12(c) Motion into one for

summary judgment. *See State Farm Fire & Cas. Co. v. Spradling Home Inspections, LLC*, No. 4:10-CV-01887NAB, 2011 WL 4056042, at \*3 (E.D. Mo. Sept. 13, 2011) ("The Court also notes that since Plaintiff presented matters outside of the pleadings in its cross-motion for judgment on the pleadings, the Court, if the pleadings had been closed, would have been obliged to treat the parties' Rule 12(c) motions as cross-motions for summary judgment. However, because of the procedural posture of this case, . . . the Court cannot take the step of converting the 12(c) motions into motions for summary judgment and engaging in the appropriate analysis.") (citation omitted).

Based on these circumstances, this case should proceed into discovery, where the numerous factual disputes can be fully fleshed out. From there, and at the appropriate time, the Court will consider motions for summary judgment, and, if necessary, a trial will be held to resolve any remaining material fact disputes. But as positioned today, this is not the matter that can or should be summarily determined at the Rule 12(c) stage. Therefore, the Motion is denied to these ends.

## ORDER

Accordingly, **IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Judgment on the Pleadings (Dkt. 25) is **GRANTED in part and DENIED in part**:

   a. Plaintiffs **MUST** file an amended Complaint and an amended Answer and Counterclaims **within ONE WEEK of this Order** for the sole purpose of substituting in "Stearns Bank National Association" for "Stearns Financial Services, Inc. d/b/a/ Stearns Bank National Association" as Defendant.

   b. The Motion is otherwise **DENIED**.

18

Dated: July 15, 2026                    _s/Katherine M. Menendez_____
                                        Katherine M. Menendez
                                        United States District Judge